**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COUNCIL ON RADIONUCLIDES AND RADIOPHARMACEUTICALS, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: |
| ALEX AZAR, in his official capacity as Secretary, United States Department of Health and Human Services, 200 Independence Avenue, SW Washington, DC 20201, | ) ) ) ) ) ) | |
| And | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, SW Washington, DC 20201, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiff Council on Radionuclides and Radiopharmaceuticals, Inc. ("CORAR") by and through undersigned counsel, Reed Smith LLP, hereby files this complaint against Defendants Secretary of Health and Human Services Alex Azar (the "Secretary") in his official capacity and the United States Department of Health and Human Services ("HHS"), and alleges as follows:

**INTRODUCTION AND NATURE OF ACTION**

1.      CORAR brings this action under the Administrative Procedure Act ("APA") to challenge the applicability to CORAR members of certain provisions of the Secretary's final

Medicaid rebate program rule issued on February 1, 2016 (hereinafter, the "Final Rule").  *See* 81 Fed. Reg. 5170 (Feb. 1, 2016).

2.      Specifically, the division within the Department of Health and Human Services that administers the Medicare and Medicaid programs (the Centers for Medicare and Medicaid Services, or CMS) has improperly interpreted the Final Rule to include radiopharmaceuticals within the definition of covered outpatient drugs for purposes of the Medicaid rebate program. Generally speaking, the inclusion of pharmaceutical products within the definition of covered outpatient drugs triggers a variety of obligations on the drugs' manufacturers, including an obligation to enter a rebate agreement with Medicaid as a condition to receiving Medicaid reimbursement for the products; and for the manufacturers that have entered into such an agreement, a further obligation to report certain data and information to CMS on a specified basis and to pay rebates with respect to the eligible utilization of such products under state Medicaid programs.

3.      Notably, however, there are significant differences in (among other things) the packaging, administration, and reimbursement methodologies for radiopharmaceuticals, relative to more "traditional" pharmaceutical products.  For example, by their explicit terms, the reporting requirements and criteria set forth in the Final Rule are tailored to reimbursement schemes and dosage measurements applicable to non-radiopharmaceuticals and do not reference, account for, or contemplate the reporting of information unique to radiopharmaceutical manufacturers.  Despite these material distinctions, CMS has refused to provide any guidance or clarification to CORAR members that have entered into Medicaid rebate agreements to explain how they should properly report information to satisfy the requirements of the Final Rule.  As a result, CMS's inaction subjects radiopharmaceutical manufacturers to significant potential

penalties for noncompliance with the reporting requirements and criteria referenced in the Final Rule.  Similarly, manufacturers of covered outpatient drugs that do not properly enter Medicaid rebate agreements face the potential of CMS determining that the relevant drugs are not eligible for Medicaid reimbursement.

4.     Plaintiff seeks declaratory relief through a court order ruling that the Final Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law pursuant to 5 U.S.C. § 706(2)(a), to the extent that it purports to apply the Medicaid rebate statute to radiopharmaceutical products.  Plaintiff has no administrative remedies available to address these inequities and is now forced to bring this suit.

5.     Such relief is necessary and appropriate in light of the continuing risks to CORAR members, including both those who participate and who do not participate in the rebate program, given the inapplicability of the statute, the impossibility of compliance under current regulations, the potential exposure to substantial civil money penalties, and the potential adverse impact on Medicaid coverage for their products under the Medicaid program.

## JURISDICTION AND VENUE

6.     This action arises under the laws of the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and jurisdiction to provide declaratory relief under 5 U.S.C. §§ 701-706.

7.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e), as the United States Defendants are located in this district.

## THE PARTIES

8.     CORAR is a trade association, incorporated in Delaware, with its principal place of business located at 500 North Capitol Street, NW, Suite 210, Washington, DC 20001-7407.

3

9.      CORAR asserts its claims on behalf of its member entities.  CORAR is comprised of member companies in the United States and Canada that manufacture and distribute radiopharmaceuticals, sealed sources, radionuclides, and contrast agents primarily used in medicine and life science research.  CORAR's mission and activities include advocacy for regulations and legislation that facilitate the growth and viability of its member companies, including participation in the legislative and regulatory process at the federal and other levels of government, to ensure appropriate treatment and governmental reimbursement for radiopharmaceuticals, radionuclides, radioactive products used in life sciences, and other medical imaging agents.

10.     CORAR's members include entities that have entered into rebate agreements with the Secretary under the Medicaid rebate program, as well as entities that have not entered into rebate agreements.

11.     Defendants are appointed officials of the United States government and the United States Executive Branch agency responsible for the administration of the federal Medicaid program, including the Medicaid Drug Rebate program ("MDR").

12.     Defendant Alex Azar is the Secretary of HHS.  In this capacity, he has responsibility for the management and operation of HHS.  Azar is sued in his official capacity only.

13.     Defendant HHS is an executive agency of the United States government and is responsible for, among other things, the administration of the federal Medicaid program established pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*., including the MDR program established pursuant to 42 U.S.C. § 1396r-8.

## FACTUAL BACKGROUND

## The Federal Medicaid Program

14.     The federal Medicaid program is a joint federal-state program established pursuant to title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*., to provide medical care and related services to specified classes of individuals who may be eligible for benefits by virtue of their medical and/or financial need.

15.     The Secretary is responsible for the federal administration of the Medicaid program, and exercises that authority primarily through the Centers for Medicare & Medicaid Services ("CMS"), a component agency of HHS.

16.     The federal and state governments jointly fund the Medicaid program, with federal matching funds being available to cover a portion of state expenditures.  As a condition to receiving federal matching funds, a state agency must submit, secure the Secretary's approval of, and administer, a "state plan" for medical assistance which meets the requirements of 42 U.S.C. § 1396a and other provisions of the Medicaid statute.

17.     Among other things, the Medicaid statute requires that the state plan must provide for the coverage of certain "mandatory" health care services, and also may provide for the coverage of certain "optional" services.   42 U.S.C. § 1396a(a)(10).   Among the mandatory services that states must cover are inpatient and outpatient hospital services, and outpatient prescription drugs are among the optional services that states may cover under their programs. *See id*. § 1396d(a).  To the extent that a state provides coverage for outpatient prescription drugs, it must further meet the requirements of the Medicaid rebate statute, 42 U.S.C. § 1396r-8.  *See id.* § 1396a(a)(54).

### The Medicaid Rebate Statute

18.     Congress enacted the Medicaid rebate statute in 1990 as Section 1927 of the Social Security Act.  The rebate statute reflected a relatively simple legislative "bargain": as a condition to federal Medicaid matching funds being available to state Medicaid programs for a manufacturer's "covered outpatient drugs," the manufacturer must enter into a rebate agreement with the Secretary under which the manufacturer will pay rebates to state Medicaid programs with respect to those "covered outpatient drugs" of the manufacturer that have been reimbursed by the states' Medicaid programs.

19.     The amount of the rebate is set by statute, and for most brand-name drugs, the minimum rebate is currently equal to 23.1% of the drug's "average manufacturer price" ("AMP").  *See* 42 U.S.C. § 1396r-8(c)(1).  In many cases, the rebate percentage may be even greater due to a manufacturer offering deeper "best price" discounts to its commercial customers or to an "additional rebate" that is due to the extent that a product's current AMP exceeds the product's AMP from the "base period" in which it was initially marketed, adjusted for inflation. *See id.* § 1396r-8(c)(1)(C), (2).

20.     By its terms, the rebate statute only applies with respect to "covered outpatient drugs."  The statute generally defines "covered outpatient drugs" as the subset of "prescribed drugs"  that have been approved by the Food and Drug Administration ("FDA") under specified sections of the Federal Food Drug and Cosmetic Act ("FFDCA").   42 U.S.C. § 1396r-8(k)(2)(A)(i).

21.     However, the statute further qualifies that general definition with a "limiting" definition in the succeeding paragraph (3):

> The term "covered outpatient drug" does not include any drug, biological product, or insulin provided as part of, or as incident to and in the same setting as, any of

the following (and for which payment may be made under this title as part of payment for the following and not as direct reimbursement for the drug):

(A) Inpatient hospital services.

(B) Hospice services.

(C) Dental services, except that drugs for which the State plan authorizes direct reimbursement to the dispensing dentist are covered outpatient drugs.

(D) Physicians' services.

(E) Outpatient hospital services.

(F) Nursing facility services and services provided by an intermediate care facility for the mentally retarded.

(G) Other laboratory and x-ray services.

(H) Renal dialysis.

42 U.S.C. § 1396r-8(k)(3). By virtue of this "limiting definition," the rebate program is inapplicable to drugs that are administered as part of a broader medical procedure.

## **Medicaid Rebate Program: Basic Operational Mechanics**

22. Once a manufacturer of covered outpatient drugs enters into a rebate agreement with the Secretary, the manufacturer must periodically report certain data to CMS pursuant to that agreement. First, the manufacturer must report certain basic product information concerning each of its "covered outpatient drugs." Such data must be reported for each product based on the product's National Drug Code ("NDC") number. The NDC number is an 11-digit code issued by the FDA to identify unique drug products. The first five digits (known as the labeler code) generally identify the manufacturer of the drug, the next four digits (known as the product code) generally identify the individual product, and the last two digits (known as the package size code) generally identify the package size for the drug.

23.     The product data to be reported includes, among other things, the name of the drug, its NDC number, whether it is an "innovator" (*i.e.,* brand) or "noninnovator" (*i.e.,* generic) drug, the "unit type" of the drug, and the number of units in the package size.   The rebate program only recognizes eight valid "unit types" for reporting purposes:

AHF = Injectable Anti-Hemophilic Factor

CAP = Capsule

SUP = Suppository

GM = Gram

ML = Milliliter

TAB = Tablet

TDP = Transdermal patch

EA = EACH

24.     In the case of the "EACH" unit, CMS has issued restrictive guidance concerning when that unit type may be used and the number of "units per package size" that may be reported:

> When using the Unit Type EACH, decimal quantities are never valid in the Units Per Package Size (UPPS) field because EACH denotes a whole package regardless of the amount of drug (ML, GM, etc.) in the package. The following are the only situations for which it is appropriate for labelers to use the Unit Type EACH:
>
> 1. Powder-filled vials, ampules, syringes and packets (same UPPS for multiple packages)
>
> 2. Kits containing two or more different items dispensed under one NDC and sold at a single price

CMS Manufacturer Program Release No. 73 (Apr. 25, 2006).

25.     In addition to reporting product data, manufacturers must report pricing data with respect to each of their covered outpatient drugs.   Specifically, on a monthly basis, the manufacturer must calculate and report the AMP for each drug to CMS, and on a quarterly basis, the manufacturer must further calculate and report the quarterly AMP and, for single source and innovator multiple source drugs, the "best price" ("BP") for the drug.   The AMP and BP are calculated and reported on the basis of the 9-digit NDC code, such that all package sizes of a given product will have the same AMP and BP.   Manufacturers must submit such reports to CMS within 30 days of the end of each month or quarter, as applicable.   42 U.S.C. § 1396r-8(b)(3)(A).   A participating manufacturer's failure to submit the required pricing data to CMS on a timely basis, or the knowing submission of incorrect data by a participating manufacturer, may subject the manufacturer to substantial civil money penalties.   *See id*. § 1396r-8(b)(3)(C).

26.     Based on this data, CMS calculates a quarterly "unit rebate amount" ("URA") for each 9-digit NDC product, based on the statutory formulas set forth in 42 U.S.C. § 1396r-8(c), and provides the URAs to the states.

27.     On an ongoing basis during a calendar quarter, pharmacies fill prescriptions for Medicaid patients and bill the respective state Medicaid program, generally based on the NDC number of the product dispensed to those patients.   The states then aggregate this claims data and, within 60 days of the end of each calendar quarter, submit a rebate invoice to each participating manufacturer based on the number of units of each of the manufacturer's covered outpatient drugs and their applicable URAs.   42 U.S.C. § 1396r-8(b)(2).

28.     Manufacturers must then pay or dispute such quarterly invoices to the states within thirty days of the states' invoices.   42 U.S.C. § 1396r-8(b)(1).

**Radiopharmaceutical Products: Distribution, Dose Preparation, and Administration**

29.     Radiopharmaceutical product components are approved by the FDA as prescription drugs under section 505 of the FFDCA, but unlike traditional prescription drugs, they are either themselves radioactive and/or used to produce radioactive "patient ready" doses. Given this characteristic, their distribution, preparation, dosing, and billing are distinguishable from most traditional oral or injectable drugs available through retail pharmacies; unlike traditional oral or injectable drugs, radiopharmaceuticals are never available through retail pharmacies.

30.     Radiopharmaceuticals are used primarily as part of a variety of diagnostic imaging, and in some cases, therapeutic procedures.  These procedures are performed only in medical settings, such as a hospital or imaging center, and, unlike most traditional oral and injectable drugs, radiopharmaceuticals cannot be self-administered, and instead must be administered only by medical professionals (e.g., radiologists with specialized training in handling and administering radiopharmaceutical products).

31.     Unlike traditional retail drug manufacturers, radiopharmaceutical manufacturers generally do not sell products to retail pharmacies which are in a form that can be readily dispensed directly to a patient.  Instead, radiopharmaceutical manufacturers sell the radioactive and non-radioactive components to specialized nuclear pharmacies (that must meet unique licensure criteria) to prepare patient-ready doses.  Both radioactive and non-radioactive components bear FDA-issued NDC numbers.  In other words, the distribution units of a radiopharmaceutical component sold by a manufacturer cannot be administered either directly to or by a patient.

32.     Nuclear pharmacies may be based at a hospital, but more commonly, they are freestanding, independent organizations that prepare "patient-ready" doses in response to hospital or imaging center orders on a contract basis, typically based on a price per dose or similar charge structure.  The nuclear pharmacies then deliver the patient-ready doses to the hospital or imaging center, the hospital or imaging center injects them into the patient, and then finally, the hospital or imaging center performs the associated imaging or other procedure on the patient.  The hospital or imaging center provider then bills the applicable third party insurer or other payor for the procedure and/or radiopharmaceutical imaging agent.

33.     Broadly speaking, there are two types of radiopharmaceutical doses prepared at nuclear pharmacies: noncompounded doses that are drawn from manufacturer product containers, and doses that are compounded.

34.     Noncompounded products are typically manufactured in multidose liquid vials, which contain a radioactive ingredient in a solution estimated to yield a defined quantity of radioactivity (typically expressed in millicuries or microcuries).  Nuclear pharmacists at a nuclear pharmacy extract patient-ready doses into individual syringes intended to yield the amount of radioactivity ordered by the physician for the time of administration.  Since, by their nature, radiopharmaceutical products "decay" over time, the amount of radioactivity in the patient-ready dose at the time it is extracted at the pharmacy will generally be more than the amount in the dose at the time it is administered to the patient.  Accordingly, the number of doses obtainable from a particular vial or component is indeterminate, and will depend on the size of the patient, the time of preparation in relation to the time of administration to the patient, radioactive decay rates, and other factors.  Nuclear pharmacies then ship the radioactive patient-

ready dose in the syringe to the provider for administration; these patient-ready dose syringes do not have any individual NDC number.

35.     Compounded radiopharmaceutical products are the more common type of patient-ready dose, and typically involve doses that have been radiolabeled with technetium-99m ions. These doses are generally prepared using three product components, each of which may bear a different 9-digit NDC and may be sold by different manufacturers: (i) a nonradioactive kit vial containing a lyophilized powder (sometimes referred to as a "cold kit"); (ii) saline; and (iii) a radioactive "generator" containing a specified quantity of radioactive material such as molybdenum-99.

36.     To produce a patient-ready dose, a nuclear pharmacist will attach a saline vial to a generator, and when the saline interacts with the radioactive elements within the generator, the appropriate radioactive ions (*e.g.,* technetium-99m) will be eluted into a solution and collected in a separate vial.  Notably, the amount of technetium-99m (typically measured in millicuries) that a generator can produce for patient-ready doses is indefinite, and will vary depending on factors such as radioactive decay rates, the amount of material within the generator, and the frequency with which the generator is used.  The nuclear pharmacist then combines the technetium-99m solution with the contents of the kit vial, producing a vial of radiolabeled product.  From this vial, an indeterminate number of patient-ready doses can be extracted into individual syringes. Similar to the case of noncompounded radiopharmaceuticals, the number of patient-ready doses the nuclear pharmacist extracts is based on the amount of radioactivity ordered by the physician, the scheduled time for administration to the patient, and the decay rates.  Again, there is no FDA-assigned NDC number with respect to a compounded patient-ready dose, and in fact, a

compounded patient-ready dose might actually be comprised of materials from three different NDC number components.

**Provider Billing for Procedures Using Radiopharmaceutical Products**

37.     Unlike traditional pharmaceutical products, neither pharmacies nor nuclear pharmacies submit claims to state Medicaid programs for radiopharmaceutical products.  Instead, as reflected above, radiopharmaceutical products are only used as part of associated imaging or other procedures at a hospital or imaging site, and those provider entities submit claims for the procedures and/or products.

38.     However, whereas retail pharmacies generally bill third party payors using NDC codes associated with the distribution package for the specific manufacturer's drug dispensed to the patient, providers instead bill for the patient-ready dose of a radiopharmaceutical product associated with an imaging or other procedure on the basis of codes established under the Healthcare Common Procedure Coding System ("HCPCS Codes").  Specifically, providers identify radiopharmaceutical products on claims forms using five-digit alphanumeric "A-codes," and in many cases, these "A-codes" do not distinguish between which manufacturers' radiopharmaceutical NDC components were used to prepare a patient-ready dose.  For example, providers use the single code A9500 for a patient-ready dose of technetium-99m sestamibi, a common compounded radiopharmaceutical, even though there have been at least five different "cold kit" manufacturers, three different generator manufacturers, and an unknown number of saline manufacturers whose respective products may have been used to prepare a given dose.  In other words, the product codes used by providers in billing systems (*i.e.,* the HCPCS A-codes) are completely different from the NDC codes associated with the units of radiopharmaceutical

product components that are distributed by manufacturers to nuclear pharmacies and which manufacturers must use to calculate and submit pricing data.

39.     Moreover, the units of measure associated with the A-codes used in the billing systems do not correspond to any of the permitted units of measure recognized in the Medicaid rebate program.  Specifically, the "billing units of measure" associated with radiopharmaceutical A-codes are either "doses," "millicuries," or "microcuries."   None of these units of measure corresponds to any of the CMS-recognized units of measure, nor is there any consistent or identified methodology to "crosswalk" the NDC-based distribution units to the HCPCS-based coding units, given that the number of doses, millicuries, and microcuries that may be extracted from a cold-kit and/or generator is indeterminate as described above.

40.     There are multiple third party payment methods associated with provider imaging procedures using radiopharmaceutical products.  In many cases, the provider receives a fixed, all-inclusive payment for the procedure which covers the provider's costs of the radiopharmaceutical as well as the cost of the imaging procedure.  In other cases, the provider may receive separate "line item" payments for the radiopharmaceuticals and the associated imaging procedure.   In either event, however, the radiopharmaceutical is not reimbursed independently of a procedure.

41.     Radiopharmaceutical products have been approved and marketed in the United States since the inception of the Medicaid rebate program.  However, in the case of state Medicaid programs, prior to 2010, CMS's Medicaid rebate claims payment database reflects virtually no claims having been paid by states for radiopharmaceutical products.  Since that time, the database reflects only modest payments for very small numbers of such products.  Moreover,

that data reflects clear anomalies, such as payments for NDCs associated with "cold kits" without any apparent corresponding payments for NDCs associated with generators.  (CMS's public rebate claims database may be accessed at

https://www.medicaid.gov/medicaid/prescription-drugs/state-drug-utilization-data/index.html.)

## **Radiopharmaceuticals Cannot Be Covered Outpatient Drugs Because They Are Not "Prescribed Drugs"**

42.     In accordance with the statutory definition, to be a covered outpatient drug, a product must be <u>both</u> a "prescribed drug" <u>and</u> approved under one of the specified sections of the FFDCA.  *See* 42 U.S.C. § 1396r-8(k)(2)(A)(i).

43.     "Prescribed drugs" in turn are "simple or compound substances or mixtures of substances prescribed for the cure, mitigation, or prevention of disease, or for health maintenance" that are prescribed by physicians and dispensed by licensed pharmacists.   42 C.F.R. § 440.120(a).

44.     The component parts of compounded radiopharmaceuticals sold by CORAR members are not individually prescribed by a physician or dispensed by a pharmacist.

45.     CMS has taken the position that components used to create a compounded radiopharmaceutical—including the nonradioactive kit vial containing a lyophilized powder ("cold kit"), and the radioactive "generator" containing a specified quantity of radioactive material such as molybdenum-99 [see ¶ 35 above], both of which are sold by CORAR members—are each covered outpatient drugs for purposes of the Medicaid rebate program. However, neither the cold kit nor the generator is prescribed individually nor could they ever be. Instead, only the compounded patient-ready dose which is comprised of all the combined

component parts is prescribed by a physician and dispensed by a pharmacist.  Notably, in the case of non-radioactive drugs that are compounded from active pharmaceutical ingredient components ("APIs"), CMS has taken the position that the compounded product is the patient ready dose and may be covered under Medicaid, but that the component APIs are not covered outpatient drugs.

46.     Individual components of radiopharmaceuticals do not satisfy the regulatory definition of "prescribed drugs," and thus cannot constitute covered outpatient drugs, even though those components have been approved under the FFDCA.

### CORAR's Interactions with CMS and The Secretary's Final Rebate Program Rule

47.     For much of the Medicaid rebate program's history, the Secretary had not promulgated comprehensive implementing regulations governing the Medicaid rebate program or addressing the unique circumstances of radiopharmaceuticals.

48.     In 2010, CORAR met with CMS officials to request the agency's clarification that radiopharmaceutical product components are not covered outpatient drugs for purposes of the Medicaid rebate statute, in light of the statutory limiting definition, the insurmountable difficulties associated with price reporting and rebate claims processing for decaying products that can produce indefinite numbers of doses, and CMS's related policy that "active pharmaceutical ingredients" and excipients used to compound drugs are not within the scope of the statute.

49.     Nearly a year later, in October 2011, CMS issued an informal letter response declining to issue such a clarification and noted that radiopharmaceutical "products" may qualify as covered outpatient drugs where they are separately reimbursed.

50.     Shortly thereafter, and following substantial amendments to the Medicaid rebate statute as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, CMS issued a proposed rule to implement the Medicaid rebate program.  *See* 77 Fed. Reg. 5318 (Feb. 2, 2012).  The proposed rule did not address radiopharmaceuticals.

51.     In response to the proposed rule, CORAR submitted public comments reiterating its position that radiopharmaceuticals do not constitute covered outpatient drugs, but also contacted CMS to discuss further the potential changes to rebate program processes and guidance that would be necessary to facilitate reporting of radiopharmaceutical products. Following multiple meetings with CMS rebate program staff in 2012, including a tour of a nuclear pharmacy's compounding operations, CORAR provided CMS with a detailed list of operational and policy clarifications and changes that would be needed to facilitate rebate program participation in the context of radiopharmaceuticals.   Following that submission, however, CMS ceased interactions with CORAR notwithstanding multiple inquiries from CORAR.

52.     Nearly four years later, on February 1, 2016, CMS issued a final rule governing the Medicaid rebate program.  81 Fed. Reg. 5170 (Feb. 1, 2016).  The final rule essentially restates the statutory definition of "covered outpatient drugs," including the limiting definition, but makes no reference to radiopharmaceutical products.  *See* 42 C.F.R. § 447.502.

53.     However, in its response to public comments regarding radiopharmaceuticals' status as covered outpatient drugs, CMS stated its position that "radiopharmaceuticals qualify as a [covered outpatient drug] because of the approval process undergone with FDA under section 505 of the [Federal Food Drug and Cosmetic Act]."  81 Fed. Reg. at 5185.  Moreover, CMS clearly states the resulting obligations for radiopharmaceutical manufacturers: "[R]adiopharmaceuticals are to be reported to the MDR program in the same manner as other [covered outpatient drugs] for the purposes of the administration of the MDR program."  *Id.* Manufacturers who fail to make these reports risk civil monetary penalties ("CMP") and referral to the Office of Inspector General.  *See* 77 Fed. Reg. at 5343, Medicaid Program; Covered Outpatient Drugs.  However, the agency failed to address either the "prescribed drug" requirement or the application of the limiting definition to radiopharmaceuticals in light of the fact that they are furnished in connection with other procedures and the absence of historical inclusion of the products within the rebate program.

54.     Further, although CMS acknowledged "challenges" in reporting product and pricing information for radiopharmaceuticals, its final rule did not provide any guidance to manufacturers to meet those "challenges."  *Id.*  Nor has CMS provided any such guidance subsequent to the publication of the final rule.

55.     More recently, CORAR requested a meeting with CMS officials to request that CMS issue clarifying guidance that radiopharmaceutical product components do not constitute covered outpatient drugs for purposes of the Medicaid rebate program.  On February 13, 2018, CORAR representatives met with CMS representatives responsible for CMS's interpretation of what constitute covered outpatient drugs for purposes of the Medicaid rebate program, including

Dr. John M. Coster, Director of the Division of Pharmacy, Center for Medicaid & CHIP Services within CMS.

56.     At the February 13, 2018 meeting with CMS, CORAR representatives (1) explained that radiopharmaceutical product components do not constitute prescribed drugs, and thus cannot be covered outpatient drugs within the agency's statutory and regulatory definitions of those terms; and (2) again demonstrated that the existing regulatory scheme does not expressly or implicitly contemplate that radiopharmaceuticals constitute covered outpatient drugs.  This is reflected by, among other things, the fact that the reporting requirements and criteria set forth in the Final Rule are tailored to reimbursement schemes and dosage measurements applicable to non-radiopharmaceuticals and do not reference, account for, or contemplate the reporting of information unique to radiopharmaceutical products.

57.     At the meeting, Dr. Coster, the CMS Director of the Division of Pharmacy, expressed the view that questions concerning the applicability of the covered outpatient drug definition and requirements to radiopharmaceuticals had already been resolved and addressed in the Final Rule.

58.     Following the meeting, on February 16, 2018, CORAR electronically submitted a letter to Dr. Coster and other CMS staff reiterating why radiopharmaceuticals do not constitute covered outpatient drugs, and asking CMS to notify CORAR within seven days whether further communications between counsel for CMS and counsel for CORAR may be warranted.

59.     CMS acknowledged receipt of CORAR's February 16, 2018 letter, but as of the date of filing this Complaint CMS has declined to issue any clarification, and has not responded to CORAR's invitation for further communications between the parties' respective counsel.

60.     Thus, following years of CORAR's submissions to CMS on the issues identified in this Complaint, CORAR's emphasis on the continuing risks to CORAR members as described herein (the potential exposure to substantial civil money penalties and the potential adverse impact on Medicaid coverage for their products under the Medicaid program), and despite CORAR's request for CMS to address such continuing risks, CMS has refused to take further action.  Accordingly, CORAR members are compelled to seek judicial intervention lest the ever-increasing risks reach levels inconsistent with the rational operation of a business.

## COUNT 1:

## VIOLATION OF THE SOCIAL SECURITY ACT AND ADMINISTRATIVE PROCEDURE ACT

61.     Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint and incorporates them herein by reference.

62.     The Administrative Procedure Act requires this Court to hold unlawful any agency action that is arbitrary and capricious, an abuse of discretion, or in excess of statutory authority.  5 U.S.C. § 706(2).

63.     Radiopharmaceuticals do not meet the definition of "covered outpatient drugs" under the Medicaid rebate statute in light of the limiting definition at 42 U.S.C. § 1396r-8(k)(3).

64.     The Secretary's final Medicaid rebate rule is arbitrary, capricious, an abuse of discretion, and contrary to the provisions of the Social Security Act.  In particular, radiopharmaceutical products do not constitute prescribed drugs, and CMS's final rule reflects no consideration of that issue.  Further, the rebate statute's limiting definition at 42 U.S.C. § 1396r-8(k)(3), to the extent that it seeks to apply the rebate statute to radiopharmaceuticals,

fails to provide any standards that would enable manufacturers to report product and pricing data to facilitate participation in the rebate program.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests the Court issue judgment in its favor and against Defendants and issue the following relief:

A.  A declaratory judgment that the Secretary's final rule is invalid to the extent that it seeks to apply the rebate statute to radiopharmaceuticals, inasmuch as radiopharmaceuticals do not meet the definition of covered outpatient drugs by virtue of the limiting definition and by virtue of the fact that components of radiopharmaceuticals do not constitute "prescribed drugs."

B.  Such other relief as this Court may deem just and proper.

Dated: March 19, 2018                    Respectfully submitted,

*/s/* Andrew C. Bernasconi
Andrew C. Bernasconi (D.C. Bar No. 484614)
1301 K Street, NW
Suite 1000 – East Tower
Washington, D.C. 20005
Telephone:  (202) 414-9280
Fax:  (202) 414-9299
Email: abernasconi@reedsmith.com

*Counsel for Plaintiff CORAR*